UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

O'Brien & Wolf, L.L.P.,

   Plaintiff,

v.                    Civil No. 11-3748 (JNE/SER)
                      ORDER
Liberty Insurance Underwriters, Inc.,

   Defendant.

---

Daniel J. Heuel, Esq., O'Brien & Wolf, L.L.P., appeared for Plaintiff.

Suzanne L. Jones, Esq., Hinshaw & Culbertson, L.L.P., appeared for Defendant.

---

   Plaintiff O'Brien & Wolf, L.L.P. (O'Brien & Wolf), a law firm, sued Defendant Liberty Insurance Underwriters, Inc. (Liberty), its malpractice insurer, alleging breach of the parties' insurance contract and seeking a declaratory judgment. Liberty counterclaimed that O'Brien & Wolf breached the contract by admitting liability prior to obtaining Liberty's written consent. The case is before the Court on O'Brien & Wolf's motion for summary judgment, which the Court grants.

## I. BACKGROUND

   In early 2011, O'Brien & Wolf became the victim of a devious fraud scheme. On February 12, 2011, a person named "Jane Sato" contacted O'Brien & Wolf seeking its assistance in collecting money due to her.[1] But before the law firm could begin its collection efforts, the "debtor" contacted O'Brien & Wolf asking to avoid litigation by agreeing to a payment plan. On February 23, 2011, O'Brien & Wolf deposited into its trust account at Associated Bank a check for $110,500 that it received from the supposed debtor. On March 3, 2011, an assistant to the

---

[1]  At oral argument, O'Brien & Wolf explained that Sato provided authentic promissory notes and that the law firm confirmed that a person by the alleged debtor's name lived at the Minnesota address provided by Sato.

1

attorney working on the Sato case called Associated Bank to see if the check had cleared. Associated Bank confirmed that the check had cleared. In what appears to be an abundance of caution, the assistant called Associated Bank again on March 8, 2011 to inquire whether the check had cleared. Again, the Bank confirmed that it had. Thus satisfied, O'Brien & Wolf distributed the $110,500, as requested, to Sato's account in Japan. Then, on March 15, 2011, Associated Bank informed O'Brien & Wolf that the check was counterfeit and that it had debited O'Brien & Wolf's trust account in the amount of $110,500.

At the time Associated Bank debited O'Brien & Wolf's trust account, the account contained funds belonging to other, legitimate, clients. When O'Brien & Wolf learned of the fraud, it recognized immediately that it was in violation of Minnesota Rule of Professional Conduct 1.15. That Rule governs the management of client trust accounts. O'Brien & Wolf immediately reimbursed the trust account with its own funds and notified the Office of the Director of the Minnesota Board of Professional Liability.[2] The Office of Professional Liability informed the firm that it had acted as required under the Rules. O'Brien & Wolf also promptly notified local law enforcement as well as the Federal Bureau of Investigation (FBI).

At the time of the fraud, O'Brien & Wolf carried malpractice insurance through Liberty. Three months later, on June 17, 2011, O'Brien & Wolf sent a written notice of a claim to Liberty. Upon receiving only an acknowledgment of receipt of the notice from Liberty and no

---

[2] It is unclear whether O'Brien & Wolf replaced the trust account funds before or after contacting the Office of the Director of the Minnesota Board of Professional Liability. Heuel's affidavit states: "O'Brien & Wolf responded to that by immediately replacing the $110,500.00 out of its own reserves, and by notifying the Office of the Director of the Minnesota Board of Professional Liability, who informed O'Brien & Wolf that they had acted as required by the Rules of Professional Liability in order to avoid discipline." (Heuel Aff. 2:6). At oral argument, Heuel described the conversation with the Office of Professional Liability stating that "we called up [and] said what do we do now." He explained that the Office of Professional Liability replied: "Your clients are exposed. These claims exist against your law firm at this point in time. Do something about it."

other action on the claim, O'Brien & Wolf brought this lawsuit. O'Brien & Wolf now moves for summary judgment on its claims and Liberty's counterclaims.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Minnesota law applies to this dispute, and under Minnesota law, "[g]eneral principles of contract interpretation apply to insurance policies." *W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011) (quoting *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008)). "Insurance coverage issues are questions of law for the court." *State Farm Ins. Cos. v. Seefeld*, 481 N.W.2d 62, 64 (Minn. 1992). Insurance contracts are construed as a whole and unambiguous language is given its plain and ordinary meaning. *Seefeld*, 481 N.W.2d at 64. When interpreting insurance contracts, courts "avoid an interpretation that will forfeit the rights of the insured under the policy, unless such an intent is manifest in 'clear and unambiguous' language." *Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn. 2000) (citation omitted). Language that is susceptible to two or more reasonable interpretations is

3

ambiguous. *W3i Mobile*, 632 F.3d at 436. Although ambiguities are construed in favor of the insured, the Court may not "read an ambiguity into the plain language of an insurance contract." *Id.* (quoting *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn. 1989)). "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a) (1981); *see also Am. Warehousing & Distrib., Inc. v. Michael Ede Mgmt., Inc.*, 414 N.W.2d 554, 557 (Minn. Ct. App. 1987) (noting that an absurd construction of a contract is disfavored).

O'Brien & Wolf seeks to claim its $110,500 loss of client trust funds under its professional liability insurance policy. Liberty argues it is not liable under the plain language of the policy and that the doctrine of equitable estoppel does not apply. It argues that O'Brien & Wolf did not commit a "wrongful act" in the provision of "professional services" that resulted in a "claim" causing it to incur "damages." (Liberty Policy, Heuel Aff. Ex. A). In the alternative, Liberty argues it is not liable because O'Brien & Wolf breached the "assistance and cooperation" and "action against us" clauses in the contract.

### A. Coverage under the insurance policy

The malpractice policy at issue covered:

> . . . all **damages** in excess of the deductible amount and up to the limits of liability stated in the Declarations that **you** become legally obligated to pay, provided such **damages**:
> 1. result from **claims**
>    a. first made against **you** during the **policy period** or any extended reporting period, if applicable and
>    b. reported to **us** in writing; and
> 2. are caused by a **wrongful act** which takes place before or during the **policy period** but not before the Retroactive Date set forth in the Declarations, if any.

4

(Heuel Aff. Ex. A, at 1 (bolded words appear in the original and signify terms specifically defined in the policy)). Liberty argues that under the plain language of the policy, there is no coverage for O'Brien & Wolf's claim.

Liberty's strongest argument is that there was no "claim" and therefore there is no coverage under the policy. The policy defines "claim" as "a demand received by you for money or services, including the service of suit or institution of arbitration proceedings against you, or a disciplinary proceeding." (Heuel Aff. Ex. A, at 2). "Demand" is not specifically defined in the policy, and the context does not clarify its meaning. *See Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994) (stating that ambiguity arises when the context of a term results in more than one plausible meaning). The second part of the definition—"including the service of suit or institution of arbitration proceedings against you, or a disciplinary proceeding"—could be viewed as a list of illustrative examples of "demands." The Court could then conclude that because all the illustrative examples are formal proceedings, then "demand" must only encompass formal proceedings. But "demand" could also be interpreted broadly to effectuate an intention by the parties to include something beyond the formal proceedings specifically listed in the definition. *See Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc.*, 306 F.3d 582, 586 (8th Cir. 2002) ("[e]ach and every provision of a contract must be given effect if that can consistently and reasonably be done." (quoting *Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 119 (Minn. Ct. App. 1988))). These two equally reasonable interpretations lead the Court to conclude that "demand" is ambiguous. *See Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) ("A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation."). When confronted with an ambiguous term, courts prefer a reasonable and lawful interpretation of the contract over

one that is unreasonable or unlawful. *See* Restatement (Second) of Contracts § 203(a) (1981); *see also Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc*., 128 N.W.2d 334, 341 (Minn. 1964). Ambiguities in insurance contracts are construed in favor of the insured. *See Nathe Bros.*, 615 N.W.2d at 344.

O'Brien & Wolf argues that the clients who had money in the trust account had a legitimate cause of action against the law firm the instant the funds were withdrawn and transferred to Sato's account. O'Brien & Wolf explains that due to its immediate actions to remedy its error, these potentially aggrieved clients did not initiate a lawsuit or arbitration proceeding against O'Brien & Wolf. Upon learning of the fraud, O'Brien & Wolf immediately recognized that it was in violation of the Rules of Professional Conduct and reimbursed its client trust account. It is clear that there was no claim or demand by O'Brien & Wolf's clients.

The Rules of Professional Conduct demand that "[a]ll funds of clients or third persons held by a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts." Minn. R. Prof'l Conduct 1.15(a) (2005). Rule 1.15 goes on to provide detailed requirements for the management of client trust accounts. The Minnesota Supreme Court has made clear that misappropriation of client funds is a serious violation that usually results in disbarment. *See, e.g.*, *In re Disciplinary Action against Rebeau*, 787 N.W.2d 168, 174 (Minn. 2010) ("The misuse of a trust account is serious and will almost invariably result in a lengthy suspension or disbarment."); *In re Disciplinary Action Against Olson*, 577 N.W.2d 218, 220-21 (Minn. 1998) ("Misappropriation of client funds is a serious violation of professional responsibility which usually merits disbarment."); *In re Disciplinary Action against Lochow*, 469 N.W.2d 91, 98 (Minn. 1991) ("[W]e feel compelled to advise the bar that misuse of trust accounts in the future will [ ] almost invariably result in lengthy suspension at the very least

6

and disbarment at worst."). Even unintentional misappropriation can result in discipline. *See, e.g.*, *In re Disciplinary Action Against Kinnunen*, 502 N.W.2d 773, 775 (Minn. 1993) ("[A]n attorney's responsibility to maintain his or her trust account goes beyond a requirement to refrain from intentional wrongdoing; even unintentional misappropriation as the result of poor accounting practices may be grounds for discipline." (citing *In re Disciplinary Action against Porter*, 449 N.W.2d 713, 718-19 (Minn. 1990))).

The duty to properly safeguard client funds is an ongoing and preexisting demand on all licensed attorneys who choose to practice in Minnesota. *See In re Disciplinary Action against Varriano*, 755 N.W.2d 282, 289 (Minn. 2008) ("Attorneys licensed in Minnesota are charged with the knowledge that they must maintain trust accounts for client funds."). Liberty does not argue that an attorney can ignore his or her obligation to act in accordance with the Rules of Professional Conduct. Nor does Liberty assert that O'Brien & Wolf did not have to make restitution to its clients immediately. Indeed, restitution—that is not prompted by a fear of getting caught—is viewed as a mitigating factor in determining an attorney's disciplinary sanctions in mismanagement of client trust account cases. *See, e.g.*, *In re Disciplinary Action against Fairbairn*, 802 N.W.2d 734, 746 (Minn. 2011) ("[C]omplete restitution of misappropriated funds can constitute a mitigating factor so long as the restitution is not prompted by an attorney's fear of getting caught."); *In re Disciplinary Action against Berg*, 741 N.W.2d 600, 605 (Minn. 2007) (considering the attorney's complete restitution as a mitigating factor in his discipline). Rule of Professional Conduct 1.15 functions as a "demand" for reimbursement of O'Brien & Wolf's trust account, under a broad construction of that term. Moreover, it is a demand that should not have surprised Liberty. The Rules of Professional Conduct are known to all licensed attorneys in Minnesota and were presumably known to a company providing

7

malpractice insurance to attorneys licensed in the state. Liberty should have expected to cover demands related to misappropriation of client trust account funds by insureds. Indeed, the policy expressly covers "disciplinary proceedings," indicating that ethical violations were not categorically excluded from coverage.

Liberty's interpretation of "claim" would have required O'Brien & Wolf to leave its client trust account short funds until a client complained. The Court refuses to interpret the policy to require O'Brien & Wolf to breach its ethical duties to its clients, and thereby subject itself to certain discipline, in order to ensure coverage under its malpractice insurance. Here, a broad interpretation of "demand" is equally plausible to a narrow interpretation. The facts of this case, the principle of resolving ambiguity in favor of the insured, and the Court's preference for a lawful construction—over one that would force an ethical violation—lead the Court to construe "demand" broadly. *See* Restatement (Second) of Contracts § 203(a) (1981). Thus, because "demand" includes the standing requirement to properly maintain a client trust account set forth in Rule 1.15, there was a "claim" that triggered policy coverage.

Liberty argues it cannot be liable for any "damages" unless an indemnity obligation has been fully and finally determined by a judgment or Liberty has agreed to a settlement. The policy defines "damages" as "a monetary judgment or settlement" and goes on to exclude numerous matters. (Heuel Aff. Ex. A, at 2). This provision serves to protect the insurer from later requests for additional sums by requiring a final and known amount of damages before payment of a claim. Here, there was no judgment, but the damages sought by O'Brien & Wolf are of a known and undisputed amount—the $110,500 erroneously transferred out of the client trust account minus O'Brien & Wolf's deductible. O'Brien & Wolf's actions in allowing its trust account to be swindled resulted in a precise and ascertainable amount of lost client funds. No amount of

litigation could result in damages different than the $110,500 that O'Brien & Wolf admits it erroneously transferred out of the trust account. The Court rejects Liberty's argument that damages of $110,500 do not represent the full and final amount of the insured's obligation. Liberty further argues that O'Brien & Wolf's claim is not proper because the policy only covers "damages" that the insured becomes "legally obligated to pay." The policy does not specifically define "legally obligated." O'Brien & Wolf was clearly ethically obligated to reimburse its client trust account. *See* Minn. R. Prof'l Conduct 1.15; *see also In re Disciplinary Action against Leino*, 609 N.W.2d 616, 617 (Minn. 2000) (ordering restitution of misappropriated funds). Compliance with this ethical obligation necessarily prevented a formal legal obligation, in the form of a judgment, from coming to fruition. As discussed above, the Court refuses to interpret the policy language to require O'Brien & Wolf to shirk its ethical obligations in order to ensure insurance coverage. Liberty also argues there were no "damages" because O'Brien & Wolf replaced the funds in the client trust account and is now only seeking restitution. Liberty points to the definition of "damages" that excludes "the return of or restitution of legal fees, costs and expenses." (Heuel Aff. Ex. A, at 2). Here, the controversy is over restitution of client funds not restitution of legal fees, costs, or expenses. Moreover, the source of the funds used by O'Brien & Wolf to replenish its trust account is irrelevant. Instead, what matters for the purposes of the policy is that O'Brien & Wolf suffered a full and final amount of loss.

Liberty argues that the simple financial transactions of depositing and distributing funds are not "professional legal services." It alleges that because an assistant—not an attorney—was the person who actually conducted the transactions involving the client trust account, the actions were not "professional legal services." But the policy language clearly includes actions by non-lawyers in the scope of their employment and also covers services that "could be performed

wholly or in part by nonlawyers." (Heuel Aff. Ex. A, at 3). Moreover, O'Brien & Wolf points to the Minnesota Rules of Professional Conduct, which require all transactions involving a trust account to be approved by a licensed attorney. Minn. R. Prof'l Conduct 1.15(j). It alleges that it complied with Rule 1.15(j), and Liberty offers no evidence to the contrary. The Court finds that managing a client trust account creates a fiduciary relationship between the lawyer and client that clearly falls within an attorney's "professional legal services." Liberty's arguments that the plain language of the policy prohibits O'Brien & Wolf from succeeding on its claim fail.

This conclusion is further supported by an opinion from the Circuit Court of Appeals for the Eleventh Circuit that discussed an almost identical situation, see *Nardella Chong, P.A. v. Medmarc Cas. Ins. Co.*, 642 F.3d 941 (11th Cir. 2011). In *Nardella*, the plaintiff, a law firm, distributed funds from its client trust account in response to a fraud perpetrated by a putative client. *Id.* at 942. The court found that the insured's "erroneous transfer of its clients' trust funds to a third party was an act or omission in the conduct of its professional fiduciary duties to its clients that would give rise to a claim of negligence against it by those clients and for which it would have been liable in damages." *Id.* at 943. The policy at issue in *Nardella* provided coverage for sums that the insured became "legally obligated to pay as 'Damages' because of a 'Claim' resulting from an act or omission in the performance of, or failure to perform, 'Professional Services'. . . ." (Medmarc Policy, Heuel Supplemental Aff., ECF No. 29, at 15 (quoting terms specifically defined in the policy)).[3] The definition of "professional services" in

---

[3]  The relevant terms are defined in the Medmarc policy as follows:
"'Damages' means any compensatory monetary judgment or award, or any settlement consented to by the Company . . . ." (Heuel Supplemental Aff., ECF No. 29, at 17).
"'Claim' means a demand for money or services made against any 'Insured', including service of a suit, arbitration proceedings or a motion against any 'Insured', alleging negligent acts or negligent omissions . . . ." (Heuel Supplemental Aff., ECF No. 29, at 17).

the policy at issue in *Nardella* included "[s]ervices as a . . . trustee . . . but only for those services typically and customarily performed by an attorney." *Nardella*, 642 F.3d at 942 (quoting the Medmarc policy). The court stated that the deposit of client funds into a trust account created a fiduciary relationship between the law firm and its clients, and that the insurance policy expressly covered acts conducted in a fiduciary capacity. *Id.* The court further noted: "That the management of trust accounts is a professional service customarily performed by attorneys is indicated by the Florida Bar's devotion of an entire chapter of its rules of attorney conduct to the topic." *Id.* at 943. The court dismissed the insurer's argument that a claim against the insured would result in restitution rather than damages and does not, therefore, fall within the provided coverage. *Id.* The court explained that when attorneys erroneously distribute client trust funds to a third party they are exposed to malpractice damages—not restitution. *Id.*

Similarly, the policy at issue here also covered all "damages" that the insured becomes "legally obligated to pay, provided such damages: 1. result from claims . . . ; and 2. are caused by a wrongful act." (Heuel Aff. Ex. A, at 1). The Liberty policy defines the terms "claims" and "damages" the same way as the policy at issue in *Nardella*. O'Brien & Wolf's policy included in its definition of "professional legal services" acts performed in a fiduciary capacity, and did not limit coverage to acts "customarily performed by an attorney" as did the policy at issue in *Nardella*. The policy here was even broader covering services that could be "performed wholly or in part by nonlawyers." (Heuel Aff. Ex. A, at 3). The Minnesota Bar also dedicates an entire multi-part Rule of Professional Conduct to the safekeeping of client property. Minn. R. Prof'l Conduct 1.15. *Nardella* is on point and the Court finds the reasoning in that case persuasive.

**B. Liberty's counterclaim**

Liberty attempts to distinguish *Nardella* with its counterclaim. Liberty claims that O'Brien & Wolf breached the insurance contract by failing to adhere to the "assistance and cooperation" and "action against us" conditions of coverage.

The cooperation provision provided in relevant part: "You must not, except at your own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without our prior written consent." (Heuel Aff. Ex. A, at 8). Liberty argues that O'Brien & Wolf violated this provision when, on March 15, 2011, it reimbursed its trust account without first obtaining Liberty's permission and then did not notify Liberty until June 17, 2011. Liberty notes that this is different from *Nardella*, because there the insurer gave the insured permission to replace the trust funds. *Nardella*, 642 F.3d at 943 n.2.

In order for the violation of a cooperation clause to void an insurance policy, the insurer must prove a substantial and material breach that resulted in prejudice to the insurer. *Steen v. Underwriters at Lloyds*, 442 N.W.2d 158, 162 (Minn. Ct. App. 1989) ("A breach of the cooperation clause which is material and prejudices the insurer can void coverage." (citing *Juvland v. Plaisance*, 96 N.W.2d 537, 541-42 (Minn. 1959))). Liberty argues it was prejudiced as a matter of law because O'Brien & Wolf "settled" the matter before they even notified Liberty of a potential claim. The Court does not accept Liberty's characterization of O'Brien & Wolf's reimbursement of the erroneously transferred funds as a "settlement." But even accepting O'Brien & Wolf's action of replacing the funds as "mak[ing] a payment" in violation of the cooperation clause of the policy, Liberty cannot demonstrate that the breach was material or that it was prejudiced.

The failure to obtain Liberty's consent prior to reimbursement is not a substantial and material lack of cooperation as it is undeniable that O'Brien & Wolf is liable for malpractice and

the amount of the loss was $110,500. Liberty does not identify any strategy it could have employed to alter O'Brien & Wolf's liability or the amount of damages.

Further, Liberty has not demonstrated that it suffered prejudice as a result of the alleged breach. Prejudice can occur when the insurer loses its opportunity to protect its interests through investigation or control of the litigation. *See Hooper v. Zurich Am. Ins. Co.*, 552 N.W. 2d 31, 36 (Minn. Ct. App. 1996). O'Brien & Wolf asserts that Liberty's interests were unimpeded by its immediate reimbursement of the trust account. Liberty has not identified what additional investigatory steps it would have taken beyond the efforts of local law enforcement and the FBI. O'Brien & Wolf's quick action cut off any potential litigation, and thus, Liberty's ability to defend or control court proceedings was unaffected. In all likelihood, O'Brien & Wolf's quick response benefitted rather than prejudiced Liberty as it cut off any lawsuits or disciplinary proceedings. O'Brien & Wolf argues that had it notified Liberty prior to reimbursing the fund, the result would be the same. Liberty could have immediately reimbursed the fund itself, instructed O'Brien & Wolf to reimburse the account, or insisted that the fund remain short of funds. It is unlikely Liberty would have covered the loss itself, as it takes the position now that the policy does not even cover this type of loss. Even if Liberty wanted O'Brien & Wolf to leave the trust account short funds, O'Brien & Wolf could not have complied with such an instruction without violating its ethical duty. "My insurance company told me to do it" is not a recognized excuse for violating the Rules of Professional Conduct. Under any scenario, Liberty would be in no better position than it is today.  The Court agrees that Liberty was not prejudiced by O'Brien & Wolf's swift action.

Liberty offers minimal argument as to why its second counterclaim, based on a breach of the "action against us" clause, should not be dismissed. The Court agrees with O'Brien & Wolf's

13

analysis of that provision. The "action against us" clause was designed to prevent piecemeal or partial settlements and required that Liberty's obligation be fully and finally determined. Here, the amount of liability is undisputed, and the "action against us" clause does not apply.

### C. Equitable estoppel

O'Brien & Wolf argues, based on the reasonable expectations doctrine, that Liberty should be equitably estopped from requiring a formal "claim" as a condition precedent to coverage under the policy. "The reasonable expectations doctrine may in certain limited situations protect the reasonable expectations of the insured with respect to coverage where the literal terms and conditions of the policy bar the claim." *W. Bend Mut. Ins. Co. v. Allstate Ins. Co.*, 776 N.W.2d 693, 701 (Minn. 2009). Liberty responds that Minnesota law provides that the "doctrine of estoppel may not be used to enlarge the coverage of an insurance policy." *Shannon v. Great Am. Ins. Co.*, 276 N.W.2d 77, 78 (Minn. 1979). The court in *Shannon* explained that "it would be wholly improper to impose coverage liability upon an insurer for a risk not specifically undertaken and for which no consideration has been paid." *Id.* O'Brien & Wolf replies that it is not seeking to expand the scope of its coverage, but merely effectuate the reasonable expectations of both parties to the policy.

The Minnesota Supreme Court curtailed the availability of the reasonable expectations doctrine in insurance cases to "extreme situations . . . where a party's coverage is significantly different from what the party reasonably believes it has paid for and where the only notice the party has of that difference is in an obscure and unexpected provision." *Carlson*, 749 N.W.2d at 49. "[W]hile ambiguity is not a 'rigid requirement' for the reasonable expectations doctrine, 'in no case since *Atwater* have we used the doctrine to provide coverage in contravention of unambiguous policy terms.'" *Martin v. Morrison Trucking, Inc.*, 803 N.W.2d 365, 367 (Minn.

2011) (quoting *Carlson*, 749 N.W.2d at 48-49, and referring to *Atwater Creamery Co. v. W. Nat'l Mutual Ins. Co.*, 366 N.W.2d 271, 276, 278-79 (Minn. 1985)). This case presents both elements the court in *Carlson* found indicative of an extreme situation.

First, it was reasonable for O'Brien & Wolf to believe that an error as egregious as wrongly transferring money from its client trust account would be covered under its malpractice insurance. No law firm purchasing professional liability coverage would expect that permitting its client trust account to be pilfered would not be covered. *Cf. Atwater*, 366 N.W.2d at 276 ("[N]o one purchasing something called burglary insurance would expect coverage to exclude skilled burglaries that leave no visible marks of forcible entry or exit."). As O'Brien & Wolf points out, Liberty's interpretation of the policy would have required the law firm to intentionally disregard a Rule of Professional Conduct—by allowing the trust account to sit without more than $100,000 of its legitimate clients' money—in order not to void its insurance. The Minnesota Supreme Court considers even unintentional trust account violations to be particularly serious offenses. *See Varriano*, 755 N.W.2d at 291. Upon realizing its error, O'Brien & Wolf immediately replaced the funds and contacted the Office of the Director of the Minnesota Board of Professional Liability. The Office of Professional Liability affirmed that O'Brien & Wolf acted correctly.

Professional liability insurance is different than liability insurance carried by an everyday tortfeasor. Attorneys have ethical obligations and fiduciary obligations not required of the general population. In considering legal malpractice insurance, the Minnesota Supreme Court has noted that "this type of insurance is not only a contract between the insurer and the insured but also a contract for the benefit of the public." *Reliance Ins. Co. v. St. Paul Ins. Companies*, 239 N.W.2d 922, 925 (Minn. 1976). Clients who entrust their funds to attorneys would not

benefit if malpractice insurance law incentivized attorneys to leave trust accounts short funds until a client recognized the error and complained. An insurance company providing professional liability coverage to attorneys presumably has knowledge of the Rules of Professional Conduct when it enters into the contract. *Cf. Indianhead Truck Line*, 128 N.W.2d at 341 ("[A]n intended contractual course of legality is to be presumed in the absence of proof of a purpose to the contrary."). O'Brien & Wolf was justified in believing their violation of the Rules of Professional Conduct would be covered by Liberty.

Second, the policy language Liberty relies on to exclude O'Brien & Wolf's claim does not appear in the coverage section of the policy, but instead in the definition of "claim." Several courts have concluded that the definition section is an obscure or unexpected place to find an exclusion. *See Atwater*, 366 N.W.2d at 278 ("where major exclusions are hidden in the definitions section, the insured should be held only to reasonable knowledge of the literal terms and conditions."); *see also Babinski v. Am. Family Ins. Grp.*, 569 F.3d 349, 353 (8th Cir. 2009) (finding the reasonable expectations doctrine did not apply where the insurer "did not conceal the household drop-down exclusion in the Policy's definitions section"); *Bd. of Regents of the Univ. of Minn.*, 517 N.W.2d at 891 (rejecting the reasonable expectations doctrine argument because the pollution exclusion at issue was not hidden or obscure as it was clearly designated as an exclusion in the policy). Liberty's denial of coverage is based in part on the definition of "claim," which itself is ambiguous.

The equities in this case all align on the side of O'Brien & Wolf. The firm verified that the "debtor" lived at the address provided by Sato. It verified not once, but *twice* with Associated Bank that the check had cleared before sending payment to Sato's account in Japan. When Associated Bank later informed O'Brien & Wolf that the check was counterfeit, the firm

immediately recognized its ethical obligations and replenished the client trust account out of its own reserves. The firm verified with the Office of Professional Liability that it was in compliance with the Rules of Professional Conduct. O'Brien & Wolf reported the scheme to local law enforcement and the FBI. In hindsight, this scheme may be apparent as these fraudulent solicitations of lawyers are becoming common. But at the time O'Brien & Wolf fell victim to the fraudulent scheme, there was nothing to indicate they should have been on notice or taken additional precautions. As far as the Court can determine, this is the first case to address such a situation in the District of Minnesota. O'Brien & Wolf should not now be punished for acting swiftly and in accordance with its ethical obligations. If this is not the type of "extreme situation" contemplated by the Minnesota Supreme Court, then the doctrine of reasonable expectations is narrow to the point of extinction. *See Carlson*, 749 N.W.2d at 49.

Liberty's refusal to cover losses resulting from O'Brien & Wolf's mismanagement of its client trust account is "significantly different from what the [firm] reasonably believe[d] it ha[d] paid for," and the only language impliedly supporting a denial of coverage is in the policy's definition of "claim." In light of ambiguity in the policy language and the ethical concerns present in this case, O'Brien & Wolf is entitled to summary judgment under the reasonable expectations doctrine.

### D. Prejudgment interest and attorney's fees

O'Brien & Wolf claims prejudgment interest and attorney's fees due to Liberty's breach of the parties' insurance contract. Prejudgment interest is available where there are liquidated damages. *See* Minn. Stat. § 549.09 subd. 1(b); *see also ZumBerge v. N. States Power Co.*, 481 N.W.2d 103, 109 (Minn. Ct. App. 1992); *Anoka Orthopaedic Assocs., P.A. v. Mutschler*, 773 F. Supp. 158, 170 (D. Minn. 1991). The damages here are readily ascertainable at $110,500. Thus,

O'Brien & Wolf is entitled to prejudgment interest at 10% per annum on the $110,500, minus a $15,000 deductible, starting from June 17, 2011—the date O'Brien & Wolf provided notice of the claim to Liberty. *See* Minn. Stat. § 549.09 subd. 1(c)(2). Liberty is liable for a daily interest cost of $26.16.

O'Brien & Wolf argues its attorney's fees are recoverable under the Minnesota Declaratory Judgment Act. If O'Brian & Wolf wishes to pursue attorney's fees, it may bring a motion in accordance with Federal Rule of Civil Procedure 54(d) and Local Rule 54.3.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment [Docket No. 11] is **GRANTED**.

2. Judgment in the amount of $95,500.00 is entered against Defendant in favor of Plaintiff.

3. Defendant will pay an additional $26.16 per day in prejudgment interest starting from June 17, 2011 until the date of Judgment. Defendant will pay post-judgment interest in accordance with 28 U.S.C. § 1961(a).

4. Defendant's Counterclaims [Docket No. 2] are **DISMISSED** with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August3, 2012

    s/ Joan N. Ericksen  
    JOAN N. ERICKSEN  
    United States District Judge